IMLER v. WILLIAMS.

4-5080

Opinion delivered May 30, 1938.

288

*Gutensohn & Harris* and *Warner & Warner,* for appellant.

*T. W. M. Boone* and *Hill, Fitzhugh & Brizzolara,* for appellees.

GRIFFIN SMITH, C. J. Howard P. Williams carried two policies of insurance on his life, written by New York Life Insurance Company. Each policy was for $5,000, and named Myrtle B. Williams, wife of the assured, as beneficiary. The assured died July 17, 1937, but during the day previous to death he executed directions to the insurance company that Anna Williams Imler, his sister, be substituted beneficiary as to each of the policies. Affidavits were attached to the requests, which were made on forms supplied by the company.

The policies contained provisions that ''The insured may at any time change the beneficiary, provided this policy is not then assigned. Every change of beneficiary

must be made by written notice to the company at its home office, accompanied by the policy for indorsement of the change thereon by the Company, and unless so indorsed the change shall not take effect."

On the same day the assured undertook to change beneficiary, he executed his last will and testament, saying: "I give and bequeath to my wife, Myrtle B. Williams, and to my sister, Anna Williams Imler, in equal shares and to share and share alike, all my money, notes, bonds and other income. . . . I give and bequeath to my sister, Anna Williams Imler, all the benefits and money due on New York Life Insurance policies numbered 6,992,724 and 6,995,116 as the beneficiary thereof. The beneficiary of said life insurance policies was changed by me on the 16th day of July, 1937, naming my sister, Anna Williams Imler, the beneficiary."

Requests for change of beneficiary were received by the Little Rock branch of New York Life Insurance Company July 17, together with the affidavits. The affidavits contained substantially the following: "I am now confined in the Sparks Memorial Hospital in the city of Fort Smith, Arkansas, and am unable to leave my bed. I am insured under policy No. 6,992,724. Said policy is now in the safety deposit box at the Merchants National Bank. This safety deposit box is in the name of my wife and she has refused to open it or permit anyone else to open it. She has the key to said box in her possession. It is now my desire to change the beneficiary in said policy to my sister, Anna Williams Imler. Our joint possessions have been held in said safety deposit box for some time past. I am unable by reason of the refusal of my wife to open said box to obtain possession of said insurance policy. It is my desire and my intention that the change of beneficiary under said policy be effective immediately, and that Anna Williams Imler be named that beneficiary." The second affidavit, pertaining to the other policy, was similar.

After Mr. Williams died, both Mrs. Williams and Mrs. Imler claimed the insurance.

September 11, 1937, Mrs. Imler filed suit in chancery against New York Life Insurance Company. The following day the insurance company filed an interpleader, admitting liability, and asking that it be permitted to pay the money into court. Mrs. Williams immediately filed motion to require Mrs. Imler to make her complaint more definite and certain, and the plaintiff filed an amended answer sufficiently amplifying. Mrs. Williams then intervened. She admitted the policies in question were in her possession, and had not been in possession of the assured from date of their delivery. She denied that her husband paid the premiums; denied Mrs. Imler had been legally named beneficiary, and denied all other material matters of the complaint. She alleged that the assured orally assigned and delivered the policies to her; that such action was a gift completed by delivery; that thereupon the policies became her sole and individual property, and that her husband had never claimed any interest in them. She further alleged that she and her husband owned several pieces of real property as tenants by the entirety; that with consent of her husband she collected rents from such property, and in addition she had her personal earnings; also, that her husband regularly turned his salary check over to her, informing her the money was hers to be used as she saw fit, with the request that she place to his credit in the bank only such sums as he might need for current expenses. She alleged that she paid part of the premiums on the policies through her individual checks, and that her husband, when she made such payments, and at the times she repaid loans against the policies, told her the policies were hers, advising that the premiums should be kept up, and the loans should be paid off at the earliest possible moment. She denied statements in the affidavits made by her husband to the effect that she had refused to turn the policies over to him. Finally, it was alleged that at the time changes of beneficiary were made Mr. Williams was extremely ill; that he had been ill for some time, and his mind was so impaired he could not understand business matters, or appreciate the effect of his acts:

"He had no mental capacity to make such alleged changes. Such changes were made through the undue influence exercised upon him by his sister, the plaintiff herein, and by his physician and others whose names are to this intervener unknown."

It was then alleged that in the purported will, dated June 16, 1937, there was a declaration that the beneficiary in the policies had been changed earlier that day. Mrs. Williams stated that no children were born to her and her husband; that she renounced the will and elected to take dower. It was then urged that, even if the change of beneficiary should be upheld, the assured had the legal right to devise said policies in his will, and the will, if otherwise valid, would supersede the previous change of beneficiary, and she would be entitled to a one-half interest therein.

The chancellor found that the assured signed the forms requesting changes of beneficiary; that, at the time of signing, his mind was so impaired he could not understand business matters and did not comprehend the effect of his act; that the acts were insufficient to accomplish the purposes sought because of a failure to send the policies to the home office for indorsement, and because there was no effort, in good faith, to procure such policies; that no gift or assignment of the policies was made by the assured. No finding was made as to the rights, if any, the intervener might have to subrogation or to one-half of the proceeds of the policies as widow renouncing dower, "because such issue would only arise should the claim of a change of beneficiary be sustained." In conclusion it was found that a preponderance of the testimony sustained rights of the intervener, and that the plaintiff had failed to show a cause of action.

William K. Ward, interested in Ward Ice Industries, of Fort Smith, testified that about six weeks before the assured's death he talked with him, and at that time Williams said he would like to make a will. "The last time I saw him was on Tuesday before he died on Saturday. His mind was just as alert as it ever was." This witness said he also talked with Mrs. Williams, and she

told him she might leave her husband: "She finally told Roy and me we had better get someone out there to take care of Howard [Williams]; that she was going to leave that night. This must have been two and a half weeks before he died."

Roy Drum, of Ward Ice Industries, testified he last saw Williams ten or twelve days before his death: "He discussed his marital troubles with me. . . . His salary, in 1927, was $200 per month. It had been, I believe, as high as $250 until the depression; he also got bonuses. We always tried to give him something at the end of the year. The bonuses ranged, I think, from $1,200 top; and I think $600 was the least up until two years ago. In 1935 he received $8,000 from the Earl Ward estate. Mrs. Williams indorsed his checks from the plant—I think most of them."

Mrs. John L. Hug, nurse on duty at the hospital July 16, testified they had orders not to let visitors see the patient: "I talked with Mr. Williams—I don't remember the date—but I went in to give him a bath. He said Mr. Harris, a lawyer, was coming up; that he was going to take care of some legal business for him. Later he called me to witness his will. I talked with him the entire time I was giving the bath. I noticed nothing whatsoever wrong with his mental condition. I was in and out of his room all day long. Mr. Harris came out Friday afternoon before he died Saturday. Miss McGee and I were called in to sign as witnesses, and Mr. Harris handed Mr. Williams the will. He read it to him first and then handed it to him and told him to sign it if he wished to. Mr. Williams asked for his glasses so that he could see to sign the will, and then he signed it by himself. After Mr. Harris left, Mr. Williams did not discuss the will with me, but he did call me in there, and was discussing his troubles. I saw him until 7 o'clock Friday night. Mrs. Imler was in the room when he signed the will. She did not make any statement of any kind that I recall. I was acting supervising nurse on the floor at the time. I was not present when the purported change of beneficiary was made."

Miss McGee testified: "Mr. Harris called me into the room and I saw Mr. Williams sign his name to the will. I did not talk to Mr. Williams, and he did not say anything that I noticed. I had no chance to observe his mental condition. He sat up on the side of the bed and signed his name. Nobody helped him sit up. It was somewhere around noon, I think, on the 16th of July. Dr. Smith was not in the room."

Miss Pearl Hill, business manager of the hospital, testified Dr. Smith had given instructions that, "with the exception of Mr. Ward, Mr. Williams was not to have visitors. . . . Records show the patient was brought to the hospital [the second time] on July 16 and that he died at 11:40 p. m. July 17."

Claude Cain, agent for New York Life Insurance Company, testified he had a conversation with Williams: "I believe it was about two or three days before July 16—probably between the 12th and 14th. Howard [Williams] talked to me over the telephone about his policy, saying he wanted to make a change in his beneficiary. . . . I told him that before a designation was finally completed, it must be indorsed on the policy, and that the policy should go in with the request for change of beneficiary, and that whenever he had the policy I would come out and arrange for his signature. . . . He wanted the beneficiary changed and asked me to bring the blanks over there. That afternoon you [Mr. Gutensohn] brought me the change of beneficiary, completed, to be forwarded to the Company. . . . It was forwarded the same day."

L. E. Metz, bookkeeper for Fort Smith Ice Delivery Company, testified he saw Mr. Williams at home about three weeks before he died: "I attempted to see Mr. Williams about a week later. Mrs. Williams answered the telephone and said, 'No, you can't,' and slammed the receiver in my ear. I had known Howard Williams a long time, and when I was refused permission to see him—I knew he had a sister in Kansas City—I decided she should know about Howard's condition. So I called Mrs. Imler and asked her to come down and see about

Howard. I had never known Mrs. Imler before that time and had never seen her. . . . I knew Mrs. Williams was a Christian Science practitioner. I had heard that she had refused to let medical doctors see Mr. Williams. I had it from Doctor Smith himself that he was refused admittance to the house.''

Dr. Smith testified: ''I was Mr. Williams' doctor from June 3 on. . . . The condition I found him in did not in any way affect his brain or his mental condition. That continued up until he died. There was no change in his mental condition up until the time he died. He had one of the clearest brains I have ever seen to be so sick. . . . I went to see him on the 3d and 4th of June, and saw him again the 11th to 20th, inclusive, and on the 23d, 28th, and 29th of June. Mr. Williams wanted me to take care of him and treat him. I had difficulties with Mrs. Williams in June. The difficulties were all through his treatment. We differed in the plan of treat-ment. She did not believe in medical treatment and I did; and he did, too. She did everything to keep him from being treated medically. She thought Christian Science was the only way he should be treated, but Mr. Williams and I didn't think so. . . . Mr. and Mrs. Williams during this period of time had frequent fusses. She said she didn't want to have anything to do with him; that she was going to get a divorce. Said she didn't want to attend his filthy body, and that he had a disease that was loathsome, and as long as he was being treated medically she didn't want to have anything to do with him; that she was going to move out. I treated him July 17th—that was my last visit. I also treated him from July 1st to 6th.

''Mrs. Williams called and asked if I would mind having a consultation with Dr. Hugh Johnson. First, she wanted to dismiss me. She had threatened to several times, but Mr. Williams always wanted me to treat him. He did not pay any attention to his wife. . . . Dr. Johnson and I went in, and Mrs. Williams insisted on talking to Dr. Johnson before she would let him see Mr. Williams. She wanted Dr. Johnson, after she talked

to him, to say he couldn't do any good from a medical standpoint; that he should be treated from the Christian Science end of it. Dr. Johnson didn't like the way things were out there, and he got up and left—told her he could not take the case.

"I insisted on seeing the patient, and Mrs. Williams' brother was rather abusive. They called me all sorts of profane names. When I wanted to go upstairs, Mrs. Williams pulled a butcher knife out and said she would cut my guts out if I attempted to go up there. Finally I said, 'I can't do any good until Mr. Williams calls me.' As I went out she followed me to the door with the butcher knife in her hand. That was the 6th of July. If Mr. Williams had any more medical treatment after that, I didn't know it. But on the 15th of July Mr. Williams' sister, Mrs. Imler, called me and said Mr. Williams wanted me to come back to see him. She said Mrs. Williams had promised to let me see Mr. Williams. . . . Mr. Williams wondered what had happened to me that I hadn't been back to see him. I told him his wife wouldn't let me. He told Mrs. Williams on numerous occasions he was going to get an injunction against her on account of her not letting him receive medical attention. . . . I had a consultation with Dr. Charles Chamberlin, a specialist on heart and internal medicine. . . . I told Mr. Williams I wanted him to be absolutely quiet, and he asked if it would be permissible for a lawyer to come to see him. I said it would be if he would take it quiet and easy. . . . Mrs. Williams was to be permitted to go to Mr. Williams' room if she behaved herself."

Dr. Charles Chamberlin testified: "I first saw Mr. Williams in consultation with Dr. Smith June 12th, 13th, and 16th. I saw Mr. Williams when he was readmitted to the hospital July 16th. . . . My contact with Mr. Williams, his response to my questions, his co-operation in carrying out my instructions during examination, would lead me to feel that he was in full possession of his mental faculties and well orientated mentally. . . . Mrs. Williams asked me this: 'Doctor, can you cure

my husband?' or possibly she said, 'Can my husband be cured?' My answer, of course, was 'No.' And she said: 'Then I think I'll fire you and Dr. Smith and get another doctor.' To this I replied that the question of firing me was not pertinent because I had only seen this patient in consultation, and my business was finished.''

Paul Gutensohn, attorney, testified that on July 15th he was called by Dr. Smith, who said Mr. Williams wanted to see him; that Williams wanted to dispose of some property. The witness met Dr. Smith and they went to the Williams home: ''I took the lead and said, 'Mrs. Williams, we are friends of Howard Williams and want to see him.' She admitted us, saying, 'He is in the room to the right as you go upstairs.' Williams and Mr. Bill Harris were having personal conversations back and forth for probably five minutes. I asked Mr. Williams what he wanted, and he said, 'I want you to make a will and change the beneficiary in two New York Life Insurance policies that I have, but I can't discuss it with you now because my wife is probably listening. She has already stated that she would leave the home; that she won't be here this evening, and just as soon as I have the opportunity to talk with you about it, I will have sister call you.' He was sitting up in a chair at the time.

''I came back from lunch about one o'clock next day and found Mrs. Imler in the office. I then learned that Mr. Williams had been taken to the hospital. Mrs. Imler had mentioned that he wanted a change in the beneficiary. I went to the hospital and talked with Mr. Williams. He stated that he wanted these two policies to go to his sister, and to perform the proper acts to get that done. He said he also wanted to make a will. . . . Mrs. Williams had the policies and I was unable to get them, after calling the bank and asking for them. I secured the [serial] numbers from Mr. Cain. . . . Before Mr. Williams signed, I read over the change of beneficiary to him. There were two originals and two copies of the affidavits, and Mr. Williams had to sign six times. I left at that time. Mrs. Imler came to the office with me. Mr. Harris was there and I asked him

to go to the hospital and talk with Mr. Williams and see that we got exactly what he wanted in the will. In the meantime I turned the affidavits and the application for change of beneficiary over to Mr. Cain. . . . I had no reason to believe or feel that Mr. Williams didn't have proper mental faculties at all times I talked with him and at the time he executed those instruments; and I don't feel that, in any manner, I used undue influence to get him to dispose of his estate. I listened to him and then prepared the instruments as he wanted them."

William K. Harris, attorney, testified: "The first statement Mr. Williams made to me was to the effect that he had a little oaken box that he always kept on his dresser; that in this box he kept a key, and this key was to his lock box where he kept his insurance policies; and when he looked for the box to get the key the box was gone, and he called for his wife and asked for the box and key and stated that he wanted those insurance policies. She said to him that she didn't know where the box or key or any of it was. . . . I did not represent Mrs. Imler at that time. I was representing Howard P. Williams. Mr. Williams had employed me and asked me to come out to see him. Howard's mind was really very active. He was alert and knew exactly what he was doing."

There was other testimony for appellant.

Mrs. Williams testified the policies of insurance were issued in 1921; that her husband brought them home and gave them to her. She later put them in the bank: "He presented them to me as a present. They remained in the safety deposit box until just the other day. . . . Loans were made on the policies. I paid part of them. He just said to me to pay my money and his money—we were both paying on them to keep them clear. . . . Two checks of $1,650 each borrowed on these policies in 1934 were made payable to Mr. Williams. He indorsed the checks and gave them to me. I deposited them to my account. An extra $100 at that time came from Mr. Williams' salary. . . . Mr. Williams paid no attention to business matters at all. I

have managed the business and handled the funds ever since the first week we were married. . . . I didn't know anything about the will until after the funeral. . . . I did not have any objections to Mr. Williams receiving medical treatment if he wanted it. . . . I wrote out a telegram June 11th to Mrs. Imler: 'Howard very ill; going to hospital tomorrow. Better come.' Mr. Williams heard me call the telegraph company and read off to the clerk, and he came out into the hall and begged me so hard not to send it—said he didn't want his sister to come down here—that I didn't send it. . . . Including the home we had four pieces of property when Mr. Williams died. All the property was taken out in Mr. Williams' name and my name as tenants by the entirety. The four pieces of property are mine at this time. . . . In 1935 I was receiving $72.50 a month for renting our property. In May before my husband died he had in the bank $4,000 and something. I drew a check against the account for $3,500 on June 5th—the day before he was intending to go to the hospital I transferred that money to my account. . . . I also drew a check against his account for $404.80, payable to New York Life Insurance Company.'' Asked whether at the time of Mr. Williams' death she had a credit of $4,274.25 in the bank, Mrs. Williams replied that the amount mentioned was substantially correct.

The witness admitted she dismissed Dr. Smith, but insisted she gave her husband the best of care.

Mrs. Williams testified positively her husband's mind was not normal; that he was incapable of appreciating the effect of business transactions; that she was not unpleasant or discourteous to Mrs. Imler; did not object to her presence in the home, etc.

Two or three years before 1937, Mrs. Williams insisted that her husband go to a clinic for a general physical examination. She went with him. The examination showed he was suffering from a severe heart condition induced by syphilis. Beginning with May, 1937, Williams had become totally and permanently disabled. Disability insurance was paid from that time until his death.

His arms, legs, chest and face were badly swollen. It was Mrs. Williams' contention that Dr. Smith's treatment—injections of mercury and frequent doses of salts—was improper; that in his weakened condition Mr. Williams could not overcome debilitating effects of such treatment, and that otherwise Dr. Smith's services were unsatisfactory.

It is also insisted that Dr. Smith was extremely unfriendly to Mrs. Williams, and friendly to the sister.

Mrs. Imler's conduct in calling the agent of the insurance company for the purpose of procuring blanks for use in changing the beneficiary; the secretiveness with respect to this transaction and execution of the will; the presence of Mrs. Imler in the sick room—these and other facts, and circumstances from which inferences may be drawn, are pointed to as evidence of the unfriendly atmosphere in which Mrs. Williams found herself, and as proof of the so-called unfair methods employed by those whom it is alleged were cooperating then and who testified later in an effort to deprive her of insurance benefits.

Appellee relies upon these propositions: (1) That the weight of evidence sustains the chancellor's finding of mental incapacity. (2) That the change of beneficiary was not effective. (3) That if the will is valid, still the widow is entitled to one-half of the insurance. In support of these contentions, appellee argues (a) the conflict of testimony between Mrs. Williams and Mrs. Imler; (b) the facts and circumstances attending medical treatment; (c) the circumstances surrounding the patient at the time the attempted change in beneficiary was made and the will executed; (d) the domestic relations between husband and wife; and (e) that the policies belonged to Mrs. Williams, there having been an executed gift.

The weight of evidence does not sustain the chancellor's finding of mental incapacity. On the contrary, we are of the opinion the decided weight was otherwise. A great deal of the evidence on behalf of appellant has been set out in detail in order that its import and effect may be considered. Among the wit-

nesses on each side of the controversy are men and women of the highest character, whose sincerity of purpose cannot be questioned. There is strong testimony that the relationship existing between husband and wife during the closing days of Mr. Williams' life was strained. It is in evidence that Mrs. Williams had threatened to leave her husband, and that she contemplated a divorce. This is denied by Mrs. Williams; but it is affirmed by disinterested witnesses.

Claude Cain, agent for the insurance company, testified that between July 12 and 14 the assured called him over the telephone and stated that he wanted to make a change in his beneficiary. At that time he requested that blank forms be supplied. Dr. Smith testified that Williams asked him if it would be permissible to see Mr. Harris, saying he wanted to change his beneficiary.

Mrs. Williams testified that Mr. and Mrs. Imler left the Williams home and returned to Kansas City on Monday "before his death." July 11 was the Monday before the death Saturday, July 17. "[When they left] I told Mrs. Imler I would write her a card or letter every day telling how he was improving in mind and body. . . . On Tuesday Mr. Williams continued to improve over the condition he had been in the previous week. That afternoon I gave him a good bath and he dressed. It was the first time he had dressed since his return from the hospital in June, and I was very encouraged, very hopeful. I wrote Mrs. Imler that he was back in his right mind. . . . I thought he was coming back to his right mind. In a way he was."

Mrs. Williams then stated that on Wednesday her husband announced he was going to buy a Ford car and undertake to go back to work for the Wards, or get a job elsewhere: "I thought anyone could see, by his physical condition, that he could not go to work. On Thursday he continued to improve. He was carried to the hospital Friday. . . . Mrs. Imler went to the hospital with him. It was about 11 o'clock [in the morning]. He could hardly sit up and he could hardly talk, much less reason, and he couldn't hold a bottle of cocoa

before he left. I didn't see him any more until 7:30 Saturday night.''

The Tuesday referred to by Mrs. Williams was July 13. Mr. Cain's statement, therefore, that the assured called him on the telephone, probably between the 12th and 14th, covered the same period. Then, according to Mrs. Williams, ''On Thursday he continued to improve and on Thursday he was still about the same that he was on Wednesday, physically and mentally.''

The only three physicians who testified—Drs. Smith, Chamberlin, and Johnson—either affirmed that the patient was sane, or stated they noticed nothing to the contrary.

Severe illness, regardless of its intensity, and regardless of the near approach of death, will not of itself prevent one from exercising his or her discretion in disposing of property. In the case at bar the assured was able to sign his name, and to discuss the nature of the business in hand.

Failure of the assured to send the policies to the insurance company was a circumstance over which he had no control, and such failure will be excused. 37 C. J., § 350; 2 Couch Cyclopedia of Insurance Law, §§ 322-23; 4 Cooley's Briefs on Insurance, p. 3372; 8 Cooley, p. 1000; 78 A. L. R. 970-74-75.

In *Pedron* v. *Olds,* 193 Ark. 1026, 105 S. W. 2d 70, there was no attempt to change the beneficiary in the manner provided by the policy. There, as here, the beneficiary had no vested interest. By will the assured's daughter was substituted for his wife as beneficiary. It was held: ''The provision in the will conflicted with the provision in the policy designating appellant as beneficiary, and this being the insured's last expression on the subject, it ought to control. . . . It appears to us that the provisions in the policies above set out relating to change in beneficiary were made for the benefit and protection of the insurer as well as for the benefit of the insured. The purpose was to make certain and definite the person to whom the proceeds of the policy were to go upon the death of the insured. And it does not appear to

us that any serious consequences could result adversely to the insurer's interest by permitting a change in beneficiary to be made by will.''

If a change of beneficiary can be made by will, without surrender of the policy in those cases where by express terms it is stipulated in the contract that the only manner by which such substitution can be effectuated is through surrender for indorsement, then, by analogy, a change can be made at the instance of the assured in the circumstances reflected here.

Having reached the conclusion that Howard Williams had the mental capacity to execute the request for a change of beneficiary, and that he expressed such intent, and substantially complied with the insurance agreement, it follows that the decree must be reversed. The cause is remanded with directions to enter judgment in favor of appellant.